[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 132 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 133 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 134 
November 17, 1927. *Page 136 
The opinion of the Court was delivered by
This action was commenced on October 4, 1922, to recover damages for the alleged wrongful death of W. Baylor Richards, who was employed as a flagman by the defendant railroad company at the time of his death. Some time before Richards was killed, the defendant railroad company had employed Williams Bros. Construction Company as an independent contractor, to fill in a trestle on one of the lines of the defendant railroad company. In carrying on this work, the construction company used a steam shovel, and to understand this case it is necessary to know something of the steam shovel and its operation. The following is a description of the shovel as given by the attorneys for the appellants in their brief prepared for this Court:
"The under frame consists of a platform mounted on wheels, similar in construction to a flat car. Extending from the rear of this platform toward the middle is located a sixty horse power steam boiler. Beyond this is a hoisting engine, the engine and boiler both being covered by a shelter or cab known as the shovel house. Each corner of the front of this shovel house (the roof) rests on an upright post six inches square. A short distance in front of the shovel house is located a steel frame in the shape of the letter A; the apex of such frame extending upwards for a distance of ten feet. This frame is constructed of two wrought steel bars six inches square and is placed there for the purpose of stopping the boom of the shovel in its swing to right or left. Between the A-frame and the end of the platform is located `a hub cap known as a circle,' on which revolves a moving crane or boom. The are on which this boom revolves is 210 degrees; that is, the boom can move in either direction 15 degrees more than a right angle from the center longitudinal line of the platform on which the machine is mounted. Running through a slot in the free end of the boom is a long movable metal bar, known as the dipper stick, attached to the bottom of which is a scoop or shovel. Mounted on the *Page 137 
boom is a seat or saddle for the craneman, and also an engine known as the crowding engine, both of which revolve with it as it turns. While capable of moving through an arc of 210 degrees in a lateral direction, the boom itself is incapable of any motion in a vertical direction. So that, if operated to the full extent of its swing, it would come every time to the same place on the A-frame, which, it has been stated, was erected as a buffer to check its motion."
The shovel was stationed near the railroad track on the Bishopville branch of defendant railroad company, and was used in filling cars with dirt that were stationed on the railroad track, and the cars, when filled, were thereupon transported to the trestles to be emptied. Necessarily, the steam shovel was moved from time to time, but when in operation it was stationary, and could reach but one car at a time, and the train of cars used in hauling the dirt, consisting of about ten in number, had to be moved as each was filled, and hence, when one car was filled the train had to be moved the length of a car so as to place an empty car opposite the steam shovel. It was necessary for some one to notice the cars while being filled, and when one was filled to signal the engineer to move the train, so as to place an empty car opposite the steam shovel.
About 2 o'clock on the afternoon of September 5, 1920, Richards, a young man about 33 years old, who had been in the employment of the railroad company for about 5 years, was standing on the steam shovel signaling the engineer to move the train as the cars were filled, and was hit by a ladder, which was attached to the boom of the shovel, as the boom swung around to empty a scoop of dirt into a car that was being filled, and from the injuries thus received he died some hours afterwards.
While the construction company was an independent contractor of the railroad company, the contract of employment provided, among the other things, that the railroad company would "furnish the locomotive and train crew for the operation of contractor's [construction company's] train while" same would be occupying the railroad company's tracks. *Page 138 
The train, therefore, used in hauling this dirt, was the property of the construction company, but was in charge of the train crew furnished by the defendant railroad company, consisting of a conductor, engineer, flagman, brakeman, and perhaps others. Richards was the flagman on this train. The railroad company's co-defendant was the engineer on this train.
In the complaint, the respondent claimed the right to recover under both the State Employers' Liability Act and the Employers' Liability Act of Congress. The appellants served notice of a motion to require the respondent to elect under which statute he would proceed to trial, and when the case was called for trial at the March, 1924, term of Court of Common Pleas, it was announced by the respondent that he had elected to proceed under the federal statute.
The following agreement was thereupon entered into by the appellants and the respondent: "It was then agreed between counsel that the steam shovel on which deceased was fatally injured and the train on the defendant's track which the intestate employee was alleged to be signaling at the time of his injuries were at that time engaged in interstate commerce work, but defendant's counsel refused to admit that deceased had many (evidently any) duties to perform thereon, or that he was performing any service in behalf of the defendant railroad company at the time he came to his death."
During the trial, the appellants, at the proper times, made a motion for a nonsuit, and a motion for a directed verdict, both of which were refused. The jury returned a verdict in favor of the respondent, and after refusal of a new trial judgment was entered. The appellants have appealed to this Court upon 10 exceptions.
Exception No. 1 was abandoned by the attorneys for the appellant. Exception 2 complains of error in overruling the motion for a directed verdict, and exception 10 complains of error in refusing the motion for a new trial, and, as these exceptions raise the same questions, they will be considered together. These exceptions are based upon the contentions: (1) That the deceased, at the time he received his injuries, *Page 139 
was not working for the defendant railroad company, but for the construction company; (2) that there is no proof of any negligence of the defendants that proximately caused the injuries; (3) that the deceased's injuries were due to his own negligence; and (4) that the deceased assumed the risk which caused his death. These questions will be considered in the order named.
The first contention is that the deceased was not acting within the scope of his duties for the defendant railroad company at the time of receiving his injuries, but, on the contrary, was working for the construction company as a volunteer. It is insisted that, inasmuch as the plaintiff failed to show that Richards had been directed or required to do this work, and that the construction company had contracted to do the work required in filling in the trestles, signaling the movement of the train while filling the cars was made a part of the work contracted to be done by the construction company.
The written contract of employment between the parties, the railroad company and the construction company, while making the construction company an independent contractor, contains the following provision: "Sec. 30. The railroad company will furnish the locomotive and train crew for theoperation of contractor's train while same is occupying therailroad company's tracks. * * *"
Unquestionably, therefore, the train was to be operated while on the tracks of the railroad company only by its own crew, this being not only a matter of contract between the parties, but doubtless an exercise of sound judgment, and probably a compliance with wise operating rules of the railroad. At the time of receiving his injuries, Richards, a member of the crew, was signaling the movement of the train. The train was then occupying the railroad company's tracks, and the duty of Richards in giving such signals was as much a part of the movement and operation of the train as was the duty of the engineer, responding to such signals, to move the train in obedience to the signals thus given. *Page 140 
So, in making the contention that, when injured, Richards was not performing duties within the scope of his employment by the railroad company, the appellants do not take into consideration the terms of its contract with the construction company, nor the duties required of its employees on that occasion, including the intestate, Richards. Richards was injured while engaged in giving signals to the engineer for the movement of the train, and while the train occupied the tracks of the railroad company. The contract specifically provides that the railroad company would furnish a train crew "for the operation of contractor's train while same is occupying the railroad company's tracks * * *"; the train was then occupying the tracks of the railroad company, Richards was one of the crew furnished, and, when injured, was engaged in the performance of his duties in giving signals to the engineer for the movement of the train.
Under the contract the railroad company agreed to furnish the train crew and to operate the train upon its tracks; and the construction company agreed to operate the steam shovel, filling the cars, which, in course of operation and when filled, were carried by the train crew to the trestles and dumped. It was the duty of the railroad company to operate the train, and signaling the movement of the train to the engineer was a part of the operation; and it was the duty of the construction company to operate the steam shovel, filling the cars, and to dump same when carried in course of operation to the trestle intended to be filled.
That it was the duty of the train crew to operate the train while occupying the tracks of the railroad company seemed to be recognized by all, and properly so, because this was required by the contract; and giving signals to the engineer for the movement of the train was certainly a detail of operation and a part thereof. While this work was in progress, various members of the train crew, including the conductor and brakeman, as well as the flagman, Richards, performed the duty of signaling the movement of the train to the engineer in order to properly place the cars for loading. *Page 141 
The conductor himself, as appears from the evidence, performed this work at times, and knew that Richards also assisted in such work. Accordingly it was properly submitted to the jury to determine whether or not Richards was engaged in the performance of his duties within the scope of his employment when injured. Under the testimony, we think it was a question for the jury to determine whether or not deceased was acting within the scope of his employment.
In the case of Dixon v. Chiquola Manufacturing Co., 86 S.C. 435,68 S.E., 643, this Court quoted with approval the following from 26 Cyc., 1090, which is also found in substance in 39 Corpus Juris, 278: "The scope of a servant's duties is to be defined by what he was employed to perform, and by what, with the knowledge and approval of his Master, he actually did perform, rather than by the mere verbal designation of his position, and, where it is shown that the servants were in the habit of performing the work at which plaintiff was injured, he is not to be considered a mere volunteer."
In Texas Pacific R. Co. v. Harvey, 228 U.S. 319,33 S.Ct., 518, 57 L.Ed., 852, the Supreme Court of the United States said: "The other errors assigned concern the requests of the defendant below for a peremptory instruction in its favor because Harvey had placed himself in the window where none of his duties required him to be; but the record discloses that it was customary for a hostler's helper to get upon an engine and to look out of the cab window for the reasons we have stated, and for one helper to lend aid to another. We do not think that the testimony shows that Harvey was not in the line of his duties when he got upon the engine, or was a mere volunteer in going to help George in his work under the circumstances."
Furthermore, it seems from the testimony that the deceased was rendering a very unpleasant duty at the time of receiving his injuries, and had been doing so for some time. He was injured about 2 o'clock in the *Page 142 
afternoon on September 5th, and it was extremely hot and at a very hot place, and under such circumstances this Court will not presume that he was acting as a volunteer in rendering such services.
Now, as to the question of negligence of the defendants, if the deceased was acting within the scope of his duties, then the defendant railroad company was required to furnish the deceased a reasonably safe place whereon to perform the duties.
The railroad company furnished a cab or caboose for the use of the train crew while operating the train. This cab or caboose evidently afforded a safe place for the crew to signal the required movement of the train to load the dump cars, for the crew could give such signals either from the cupola or platform of the cab or caboose. From the cupola, or platform thereof, a trainman would not only be in full view of the steam shovel, but would have an unobstructed view over and across the flat dump cars to the engine, and could easily and safely give the necessary signals for train movement, while loading. Instead of keeping the cab or caboose upon the work, the conductor, representing, of course, the railroad company, left it continuously at the junction point, and instead used, adopted, or acquiesced in the use of a place upon the flat car which bore the machinery connected with the steam shovel. The conductor not only knew that his trainmen used this place constantly to signal the movement or operation of the train while the cars were being loaded, but used it himself for this purpose.
So, therefore, it became a question for the jury to say whether or not the railroad company in this manner used, adopted, or acquiesced in the use of this place upon the flat car, bearing the steam shovel and its equipment, for the purpose of signaling the movements or operation of the train. Was this a safe place? The testimony shows, or tends to show, that it was not.
This Court, in the case of Bunch v. American CigarCo., 126 S.C. 324, 119 S.E., 828, speaking through Mr. Associate Justice Cothran, has correctly stated: *Page 143 
"Where an injury is shown to have resulted from an unsafe place to work, a prima facie case of negligence is made out against the Master, and he has the burden of exculpating himself." The evidence in the record shows, or tends to show, that the intestate was not furnished a reasonably safe place to work, and a presumption of negligence, not only arises therefrom, but is shown by the evidence.
The Master is not only required to exercise reasonable care in selecting and furnishing a reasonably safe place to work, but to use due care to see that there are no adjacent or connected dangers or perils, which may injure the servant. In fact, not only the actual place for work, but the surrounding conditions and appurtenances, must be reasonably safe also. The Master ought to exercise reasonable care to see that the place furnished to work is free from adjacent or connected perils or dangers, as far as may be reasonably done or foreseen.
The evidence in the record shows, or tends to show, that the master in the instant case did not exercise due care in furnishing Richards, its employee, a safe place to work, reasonably free from adjacent or surrounding perils, dangers, or menaces, but by failing to exercise reasonable forethought and care in respect thereto allowed the intestate to work in an unsafe place, and that his injuries were due thereto as a proximate cause. There being evidence to sustain the contentions of the plaintiff in this respect, there was no error in submitting these questions of negligence and proximate cause to the jury.
The appellant's contention that the negligence of the plaintiff's intestate caused the injuries is based upon the alleged facts that the deceased was standing on the jack arm at the time he received his injuries, and that this was a dangerous place, in that, when the shovel, in emptying a scoop of dirt, swung as far as it could in that direction, there was always only a distance of four inches between the ladder attached to the boomed and the post at which the deceased would have been standing, and, consequently, when *Page 144 
the shovel made a full swing, which it was claimed was being done very frequently, the ladder on the boom would necessarily have hit the deceased when standing in that position.
There are two answers to this contention. The evidence does not show conclusively that the deceased was standing on the jack arm at the time he received his injuries. A disinterested party altogether, who happened to be there showing his boys the operation of the shovel, testified that the deceased was standing on the platform of the shovel at the time he received his injuries. But, even if the deceased was standing on the jack arm, and was hit as contended by the appellants, they have not satisfied this Court that the danger of such place was appreciated by the deceased. All of the employees of the construction company, who were acquainted with the operation of this shovel, perhaps knew that it was a dangerous place. They no doubt knew the extent of the swing of the shovel and of the nearness of its approach to the post against which it is claimed that the deceased was leaning. But there is nothing to show that the deceased realized this. The brakeman on this train, who, although he testified for the plaintiff, seems to have been a very impartial witness, and a witness of at least average intelligence, testified that he used the same place, and that he did not consider it very dangerous. The conductor of this train admitted on direct examination that he had seen others occupy this same position, but denied on redirect examination that he had ever seen the deceased, or anybody else, spotting cars there.
The contention that the injuries were caused by the sole negligence of the plaintiff's intestate cannot be sustained. As we have just pointed out, the evidence shows, or tends to show, that the injuries sustained by the intestate were caused by the negligence of the defendant railroad company in not furnishing a reasonably safe place to work; hence such injuries could not have been caused by the sole negligence of the intestate.
And what has been said with regard to appreciating the danger applies with equal force to the question of assumption of risk. A servant does not assume risk *Page 145 
that is attributable to the negligence of the master, of which the servant is ignorant, unless the risk was so obvious that the law charges him with notice thereof. This has been long established by the Supreme Court of the United States, SeaboardA.L.R. Co. v. Horton, 233 U.S. 492, 34 S.Ct., 635,58 L.Ed., 1062, L.R.A., 1915-C, 1, Ann. Cas., 1915-B, 475; Chesapeake O.R. Co. v. Profitt, 241 U.S. 462,36 S.Ct., 620, 60 L.Ed., 1102; and is the ruling of this Court, Barnhill v. Cherokee Falls Mfg. Co., 112 S.C. 541,100 S.E., 151. And in Barnhill v. Cherokee Falls Mfg. Co.,supra, this Court quoted with approval the language of Mr. Justice Holmes (now Associate Justice of the United States Supreme Court) in the Massachusetts case of McKee v.Tourtellotte, 167 Mass. 69, 44 N.E., 1071, 48 L.R.A., 542, that, "when we say that a man appreciates a danger, we mean that he forms a judgment as to the future, and that his judgment is right." We think that the Court was right in overruling the motion for a directed verdict, and in refusing the motion for a new trial.
At the close of the plaintiff's testimony, the appellants made a motion for a nonsuit, and at the close of all the testimony, the appellants made a motion for a directed verdict, based upon the same grounds as the motion of nonsuit. The record shows that on the motion for nonsuit the Court heard four arguments thereon, two by each side, apparently without any limitation. Upon the motion for a directed verdict being made, the following took place:
The Court: "That question of the independent contractor, what are the facts before the United States Supreme Court?"
The Court: "That is the only point you need to submit to me." (Argument by counsel for the defense.)
The Court: "I don't mean to shut you off, but there is no use for you to waste your breath."
Mr. Davis: "Your Honor, we have that case and another leading case on the subject." *Page 146 
The Court: "We will have another leading case. That does not appeal to me, to my good sense and ideas of justice."
Mr. Wolfe: "Your Honor, there is quite a distinction."
The Court: "I don't see how the liability can be shifted to somebody else."
Mr. Davis: "I have other cases, your Honor."
The Court: "I have already made up my mind."
The Court: "Have the jury come back, and proceed with the arguments to the jury."
Mr. Davis: "Your Honor will not grant the motion?"
The Court: "No, sir; I refuse the motion."
The foregoing is the basis for the third exception, which charges the trial Court with error in refusing to allow full arguments on the motion for a directed verdict, and to follow the decisions of the United States Supreme Court. Ordinarily, the conduct of the trial and the limitation of arguments on motions arising during a trial are in the sound discretion of the trial Judge. After the trial Judge had permitted full argument on the same questions on the motion for a nonsuit, we cannot see how it can be claimed that the trial Judge abused his discretion in this instance.
Furthermore, the case of Chicago, R.I. P.R. Co. v.Bond, 240 U.S. 449, 36 S.Ct., 403, 60 L.Ed., 735, which was being argued by the appellants, was not an authority for their motion. That was a case in which an independent contractor was suing his employer, and the Court held that inasmuch as he was an independent contractor, he could not recover. The question, which was presented to the trial Judge in this case, was not whether or not the construction company was an independent contractor; that was admitted by both sides. The question was: For whom was Richards working at the time of receiving the fatal injuries: Was he working within the scope of his employment for the railroad company, or was he working outside of the scope of his employment for the construction company as a mere volunteer? Had it been conceded that Richards was working for the construction company, and not within the scope of *Page 147 
his employment for the railroad company, then the case sought to be argued by the attorneys for the appellants would have been an authority for their motion, and the trial Court would have been bound to grant the motion. This exception is therefore overruled.
The Court charged the jury as follows:
"Under this Act of Congress, if a man contributes to his own injury, and is an employee of a railroad company, as in this case, that does not bar a recovery, and he might recover if he is entitled to recover, on account of the negligence of the railroad company."
And it is contended that this was a charge on the facts. While this portion of the charge does state that the deceased was an employee of the railroad company, this was an admitted fact. All of the defendant's witnesses testified that Richards was employed by the defendant railroad company. The question, therefore, before the Court, was not by whom was Richards employed, but whether or not he was acting within the scope of his employment at the time of receiving his injuries, and the jury were correctly instructed as to this in another portion of the charge. This exception is overruled.
The fifth exception is as follows:
"The Court erred in charging the jury: `Now, there is nothing in this complaint, I call your attention to that, that there is nothing in this complaint as to the Williams Bros. Construction Company, so they have nothing to do with this issue here. Simply the issues that have been stated to you; those are the only issues for your consideration. They were there doing their work, but they have nothing to do with this verdict, so far as you care, they were there doing their work, they were there just as this man in that automobile. They have nothing to do with the acts of negligence or carelessness that have been charged, so far as your verdict is concerned, because they are not parties to this action. A great deal has been said about that in the display of those pictures, and I call your attention to that that you have nothing to do with that at all' — the error being that *Page 148 
the principal defense relied on by the defendants in their evidence was that when plaintiff's intestate received his fatal injury he was performing a service for the independent contractor, the construction company, and not for the defendant railroad company, and could not have been injured by the negligence of the latter, and by this charge they were completely deprived of such defense."
We cannot see how the jury could have been led to such a conclusion as contended by the attorneys for the appellant. The Court charged the jury: "If he (Richards) was not working for the railroad when he was killed, but was working for the Williams Construction Company, as an independent contractor, and was killed by reason of their negligence, and not by the negligence of the railroad company, then the plaintiff could not recover"; and further: "If he (Richards) was purely a volunteer, and under his work with the railroad company he was not required to spot cars, if you find that, and he was doing this work of his own free will, voluntarily, and the railroad did not furnish the place where he was working, why, he can't recover." The charge must be take as a whole, and the eighth and ninth exceptions show that the jury were correctly instructed on this matter.
The sixth exception imputes error to the trial Court in charging the jury that "that Federal Employers' Liability Act applies to all persons engaged in interstate commerce." We fail to see the position of the appellant by this exception. Even if the charge is erroneous, as complained of, we do not see how it could have affected the defendants. At the outset of the trial, they admitted that, if Richards was working for them, the Federal Employers' Liability Act (45 U.S.C.A., §§ 51-59) applied to this case, and it seems to us that their situation would not have been changed in any manner whatsoever, if this statute were applicable to all persons engaged in interstate commerce.
The seventh exception is as follows:
"The Court erred in charging plaintiff's twenty-first and twenty-second requests, as follows: *Page 149 
"`(21) The duty which the master owes the servant to furnish him a safe place and safe appliances with which to work is a personal duty which the master owes the servant. The master cannot delegate this duty to another, or leave it to be performed by another, which is but another way of saying that the master cannot leave the personal duties which the law requires him to perform to another.
"`(22) But if the master does leave the personal duty of furnishing a safe place and suitable appliances to another then the master is still liable for a failure to descharge this personal duty which he owes to his servant under the law. That word "personal," I don't like that in there. I think — better strike that out. I don't think he has got to do that in person. With that amendment I charge that' — the error being
"(1) That the master is only required to exercise reasonable care and to make reasonable effort to furnish a safe place to work and suitable appliances with which to work; and (2) the remainder of the charge was inapplicable to any issue in the case and tended to mislead and confuse the jury."
In the twentieth request to charge, submitted by the plaintiff, the Court charged the jury as follows:
"`20. The law requires the master to furnish safe and suitable appliances with which to perform the work to be undertaken; and if the master fails in this duty he is guilty of negligence.'
"That is a duty which the master owes the servant. Thatought to be qualified by a reasonably safe place and applianceswith which to work."
Again in his general charge the Court instructed the jury:
"The items of negligence that I conceive that I ought to charge you on is the item of not furnishing a safe and suitable place. Reasonably safe place, not absolutely safe place. It is not required that the railroad company furnish an absolutely safe place to work — only a reasonably safe and suitable place in which to work." *Page 150 
These instructions are to be taken in connection with the twenty-first and twenty-second requests of the plaintiff, and, this done, it will be seen that the Court fully and correctly charged the jury in respect to this matter.
The twenty-first request to charge dealt with, not the extent of the duty of the master to a servant, but the right to delegate his duty. The extent of the duty had been clearly charged elsewhere. And if the contention of the respondent that the defendant railroad company had failed to furnish any place whatsoever for the work which the deceased was doing at the time he received his injuries, and the place which was furnished was that furnished by the construction company, was to be submitted to the jury, we think the twenty-second request to charge was entirely proper. This exception is overruled.
The Court charged the jury that:
"If he (Richards) was not working for the railroad when he was killed, but was working for the Williams Construction Company, as an independent contractor, and was killed by reason of their negligence, and not by reason of the negligence of the railroad company, then the plaintiff could not recover."
The eighth exception charges that this was error, in that "the jury was thereby permitted to determine the question of liability by the fact of employment alone." This exception is obviously without merit. It was conceded that the deceased was working at the time he was injured. He was either working in the scope of his employment for the defendant railroad company, or he was working as a volunteer for the Williams Construction Company, who was an independent contractor, and this charge correctly covered the matter.
The ninth exception is as follows:
"The Court erred in charging as follows with reference to the defendant's eleventh request:
"`(11) The Court charges the jury that the work being performed at the time deceased came to his death, to wit, the loading of the train with dirt, was the work of the independent *Page 151 
contractor Williams Bros. Construction Company and not the work of the defendant railroad company as master of the deceased, and that under the Employers' Liability Act of Congress under which the suit is brought the defendant railroad company is not liable, either to the employees of the Williams Bros. Construction Company or to any member of the train and engine crew furnished by it to Williams Bros. Construction Company for any injury sustained during such loading of the train.
"`I charge you that with this modification: If the railroad company put the deceased to spot cars under their direction, and if he was spotting cars under their direction, I charge you that the railroad company would be liable, otherwise they would not' — the error being that the request as presented contained a correct proposition of law directly applicable to the issues in the case, and the modification was not only confusing and unresponsive to the facts of the case, but was an incorrect statement of the law in that it made the railroad company liable under the Act of Congress for the death of one of its servants furnished to an independent contractor irrespective of any question of negligence on its part constituting the proximate cause of such death."
It seems to this Court that the modification complained of was too favorable to the appellants. As we have already held in disposing of the second exception, the question was not whether the railroad company had directed deceased to spot cars, but what he did with the knowledge and approval of his master. And as to the contention that this modification "made the railroad company liable under the Act of Congress for the death of one of its servants furnished to an independent contractor irrespective of any question of negligence on its part constituting the proximate cause of such death," the question of negligence and proximate cause had been fully and completely covered in other portions of the Judge's charge.
All the exceptions are overruled, and judgment is affirmed. *Page 152 
MR. CHIEF JUSTICE WATTS and MR. JUSTICE STABLER concur.
MR. JUSTICE CARTER did not participate.