## TEXAS & N. O. R. CO. v. BELL.

### No. 2432.

Court of Civil Appeals of Texas. El Paso.
May 8, 1930.

Rehearing Denied May 29, 1930.

Kemp & Nagle, of El Paso, and Baker, Botts, Parker & Garwood, of Houston, for appellant.

Lea, McGrady, Thomason & Edwards, of El Paso, for appellee.

HIGGINS, J.

This is a personal injury case which was submitted to the jury upon the general issue, resulting in verdict and judgment in favor of plaintiff for $25,000 damages, from which the defendant appeals.

The switching movement in which the plaintiff was engaged at the time of his injury was a matter of interstate commerce.

The appellee's theory of the case, as stated in his brief, is substantially correct. With some slight changes it is adopted.

On the night of December 6, 1928, plaintiff was working in the railroad yards in El Paso as a member of appellant's switching crew of which E. W. Mack was foreman. A lead track ran northeast and southwest through

the yard, from which at least nine switches branched off westerly. The yard was considerably up grade to the west. Plaintiff was longfieldman; that is, the one to ride cuts of cars back and set brakes on them.

The crew and switching operatives were under the direction of the foreman, Mack. The engine was at the east end of a long string of cars. A cut of cars was shoved in on track 1 or 2. Plaintiff rode them back to proper place and tied them with hand brakes. Then Mack signaled the engineer to pull back east onto the lead and told plaintiff he was going to "kick" a cut of cars in on track 8, which, according to custom, rules, and practice, meant that plaintiff should swing this cut of cars on the way back, climb to the top, and, when the cut had reached the proper place, set the hand brakes, or enough of them to hold it, especially because of this up grade. If not tied with brakes, the cut would roll back east, gain momentum, and cause destruction. So, according to his duty, plaintiff hurried from track 1 southerly to south side of the lead near the junction with track 8. About this time the cut of two or three box cars came back onto 8 at a speed of about fifteen miles an hour. He swung the rear car at the southeast corner and climbed up till half his body was on top, at which time the cut ran into a string of dead cars standing on track 8; the east end being about two car lengths from east end of switch 8, while going about fifteen miles an hour. It threw plaintiff to the ground, injuring him seriously as alleged. Plaintiff had not been in that part of the yard, did not know there were cars on track 8 anywhere near there. It was dark. He could not seem them. It was not his business to do so, nor did he throw the switch for track 8. When Mack told him he was going to "kick" a cut of cars in on track 8, it in effect meant a representation that track 8 was clear of cars and of all obstructions for as great a distance as a cut of cars would run on their own momentum when run in on track 8 at 15 miles per hour, that being the speed allowed by the rules and custom in switching, and that plaintiff must swing and mount the cut and be on top ready to set the hand brakes when the cut stopped or at least when they had gone far enough on track 8; that it was foreman Mack's business to know what part, if any, of track 8 was occupied with cars. If there was only enough space to hold two or three cars, the foreman should not have ordered the cut "kicked" in, but should have ordered the cut "shoved" in; "shoving" in being by a slow motion with the engine attached to the far end of string of cars and under signals of a switchman, the engine stopping the string at the proper place, then the switchman uncoupling the cut from the string. A kick signal is different from a shove signal. To kick a cut means the engine gets up speed, then a switchman pulls the proper pin, the engine stops with balance of string, the cut running by its momentum. A cut of cars run in on track 8 at a rate of twelve or fifteen miles an hour would, on its own momentum, run back seven or eight car lengths. It was dangerous and against the rules and contrary to custom to kick a cut of cars in on track 8 at twelve or fifteen miles an hour where all but two or three car lengths of the space is already full. They should be shoved in slowly under control of the engine.

There is a sharp conflict in the evidence as to some features of the case, but these conflicts were found by the jury in the plaintiff's favor, and, in considering the evidence, it must be viewed in its aspect most favorable to the appellee.

In support of assignments complaining of the refusal of a requested peremptory charge in its favor, appellant presents a number of propositions which assert that the evidence, as a matter of law, shows plaintiff to have assumed the risk. In different forms these propositions in effect assert plaintiff knew the cars were moving at the rate of about fifteen miles, "which is a pretty high rate of speed for cars to be kicked in," for he so testified; wherefore he assumed the risk. The undisputed evidence shows there was barely enough clearance on track 8 to hold the cars kicked on such track. If the evidence showed conclusively that plaintiff knew of this fact when he boarded the cars running at the rate of fifteen miles per hour, appellant's contention would be sound. But the evidence plainly supports the view that Bell did not know of the presence of the cars on track 8 so near the switch as to render a violent impact inevitable. It was the foreman's duty to know there was sufficient clearance upon the track to safely admit of kicking the cars thereon, and, when the foreman told plaintiff he was going to kick the cut of cars on track 8, it amounted to a representation that the track was clear for a sufficient distance to permit the cut to run thereon safely of their own momentum at the speed they were impelled thereon.

The danger was unknown to Bell, and he therefore did not assume the risk. Upon a somewhat similar state of facts in Chicago, R. I. & P. Ry. Co. v. Ward, 252 U. S. 18, 40 S. Ct. 275, 276, 64 L. Ed. 430, it was said: "Applying the principles settled by these decisions to the facts of this case, the testimony shows that Ward had neither warning nor opportunity to judge of the danger to which he was exposed by the failure of the engine foreman to cut off the cars. In the absence of notice to the contrary, and the record shows none, Ward had the right to act upon the belief that the usual method would be followed and the cars cut off at the proper time by the engine foreman so that he might safely proceed to perform his duty as a switchman by setting the brake to check the

cars which should have been detached. For the lack of proper care, on the part of the representative of the railway company while Ward was in the performance of his duty, he was suddenly precipitated from the front end of the car by the abrupt checking resulting from the failure to make the disconnection. This situation did not make the doctrine of assumed risk a defense to an action for damages because of the negligent manner of operation which resulted in Ward's injury, and the part of the charge complained of though inaccurate could have worked no harm to the petitioners. It was a sudden emergency, brought about by the negligent operation of that particular cut of cars, and not a condition of danger, resulting from the master's or his representatives' negligence, so obvious that an ordinarily prudent person in the situation in which Ward was placed, had opportunity to know and appreciate it, and thereby assume the risk."

We think the ruling in that case is applicable to the facts here presented. See, also, Payne v. Connor (C. C. A.) 274 F. 497; Montgomery v. B. & O. Ry. Co. (C. C. A.) 22 F.(2d) 359; Chesapeake & O. Ry. Co. v. Proffitt, 241 U. S. 462, 36 S. Ct. 620, 60 L. Ed. 1102; G., H. & S. A. Ry. Co. v. Andrews (Tex. Civ. App.) 291 S. W. 590; K. C. & M. O. Ry. Co. v. Estes (Tex. Civ. App.) 203 S. W. 1155; Id. (Tex. Com. App.) 228 S. W. 1087; Texas & P. Ry. Co. v. Aaron (Tex. Civ. App.) 19 S.W.(2d) 930, Wr. Ref.; St. Louis S. W. Ry. Co. v. Pope, 98 Tex. 535, 86 S. W. 5.

For like reason the doctrine of assumed risk invoked by proposition 3A is not applicable as a matter of law. The doctrine here relied upon is that which holds the servant to have assumed the risk when he may perform a service in one of two ways—one a safe way; the other dangerous—and he chooses to perform the work in the dangerous way. St. Louis Southwestern Ry. Co. v. Hynson, 101 Tex. 543, 109 S. W. 929.

The danger in this case was occasioned by the lack of insufficient clearance upon track 8, which was unknown to Bell. The doctrine announced in the Hynson Case is for this reason inapplicable. Galveston, H. & S. A. Ry. Co. v. Andrews (Tex. Civ. App.) 291 S. W. 590.

■ Complaint is made of the verdict and judgment as being excessive. The award of damages is heavy, and we have examined with care the evidence bearing upon the issue.

The testimony shows without dispute the plaintiff sustained a compressed fracture of the first lumbar vertebra, though no injury to the spinal cord appears. The fracture has healed, but the injured vertebra is in a wedge shape and will so remain. This wedge shape vertebra throws the body forward, so that he walks in a stooped position. He is obliged to use a cane, has but little strength, and has suffered severe pain practically continuously since he was injured and will probably continue to so suffer. He cannot sleep upon an ordinary bed or mattress, but must sleep on the floor or have boards underneath the mattress to keep the back in line. He is unable to sleep more than one and a half hours before he is awakened by pain. Plaintiff was 39 years old, earning $200 a month, healthy, sober, industrious, long experienced in railroad work, knew no other occupation, very little education. He was injured December 6, 1928. His case was tried October 15, 1929, at which time he had not been able to do any work.

The doctors all say the wedge shape of the injured vertebra is permanent. Dr. George Turner and Dr. H. E. Stevenson testified that they examined the X-rays, that plaintiff would always have a stiff back, would never be able to do any heavy work, and that there would be but little improvement, if any, of his condition in the future; that no improvement was shown by the X-ray taken in September over the condition shown by X-ray in May, if anything, the last X-ray showed the worst. Dr. W. L. Brown, the railroad's doctor, says in effect that plaintiff's condition is permanent, and no further improvement may be expected.

The testimony above stated sustains the view that plaintiff has been permanently injured and unfitted to pursue his calling or do other work involving hard labor; that he has suffered much pain and discomfort and will probably continue to do so the balance of his life. Under these circumstances, we would not be warranted in holding the award of $25,000 as damages to be excessive.

■ In a supplemental charge the court gave this instruction:

"You are charged that the obligation you took when you were sworn as jurors was to try this case in accordance with the law as given by the Court and the evidence admitted under the direction of the court. You will carefully heed such obligation.

"In your deliberations upon this case, you will carefully refrain from discussing other matters, and confine your consideration and your discussion to the charge of the Court and the evidence introduced."

By bill of exception it is shown that "plaintiff's attorney, Tom Lea, in his closing argument to the jury stated that he wanted to impress the jury with the idea which was given by the Court in his supplemental charge that they should not discuss any outside matters, that they should not decide the matter by lot, and should not discuss attorney's fees and said they should confine themselves to a discussion of the evidence, to which argument defendant's attorneys promptly excepted, especially that part of the argument which men-

tioned the fact of attorneys' fees because said argument called the jury's attention especially to the fact that plaintiff might or would have to pay attorney's fees and because there was no evidence on it and because said argument injected into the minds of the jury an issue and consideration which the Court by his charge had in general terms attempted to exclude from their consideration; and thereupon the said Tom Lea told the jury to confine themselves to a discussion of the evidence, and the said defendant, Texas & New Orleans Railroad Company in all things objected to the said argument .and excepted thereto for the reasons therein set forth."

Error is assigned to that portion of Mr. Lea's address, particularly his remarks concerning attorney's fees. This matter presents no error. There is no claim of any misconduct by the jury or that it considered any improper matter. No jury could be so stupid as not to know the plaintiff would have to pay his attorneys for their services.

We regard the supplemental charge as proper and Mr. Lea's comment· respecting same as legitimate.

This disposes of all questions presented.

Affirmed.