**FRED HARVEY CORPORATION v. MATEAS.**

No. 11858.

United States Court of Appeals Ninth Circuit.

Nov. 3, 1948.

Schell & Delamer, of Los Angeles, Cal. for appellant.

Walter Gould Lincoln, of Los Angeles, Cal., for appellee.

Before STEPHENS and HEALY, Circuit Judges, and BLACK, District Judge.

STEPHENS, Circuit Judge.

Elmer Mateas brought suit in California against Fred Harvey Corporation to recover damages for personal injuries allegedly sustained by being thrown from a mule belonging to the corporation. The case is in the federal court because of diversity of citizenship. At the close of the plaintiff's case, the court, sitting without a jury, granted defendant's motion for a judgment of dismissal and plaintiff appealed. This court reversed the judgment and remanded

the case for a new trial. 146 F.2d 989. The second trial was to the court and jury and resulted in a verdict for the plaintiff and we are now considering the defendant corporation's appeal from the judgment entered in accordance therewith. For clarity we shall generally refer to the defendant-appellant as Harvey and to plaintiff-appellee as Mateas.

Harvey maintained a resort hotel on the south rim of the Grand Canyon in Arizona, and in conjunction therewith maintained mules for rental to excursionists on trips into the canyon. The trips were customarily made in groups, each of which was led on the trail by an experienced guide. Before the start, the guide, together with the trail foreman, assigned a mule to each individual rider.

Mr. Mateas and his wife, while at the hotel, read a circular provided by Harvey and decided to take the trip. The circular read: "Trail Trips Into the Canyon. Although visitors may venture short distances down these trails on foot, the accepted mode of travel for longer journeys is by the famous Grand Canyon mules. These faithful, sure-footed animals, in charge of experienced guides, hold a 30 years record of carrying many thousands of inexperienced riders down the trail and back in perfect safety." Mateas informed Harvey's employees that he had never ridden a mule or a horse nor any animal excepting a burro a few times in early childhood, and was told by them that most of those who took the trips were inexperienced riders.

Mateas and his wife, after assignment to mules and to places in a single string of seven, started down the trail. The guide was in the lead, while Mateas brought up the rear on a mule named "Chiggers."

This was Chiggers' first trip down the canyon with an excursion party since being brought in from winter pasturage. During the taking of testimony, the guide was asked by a juror whether or not this mule had been No. 7 in a string before, to which the guide answered, "More than likely he was, yes." Question: "Had he at times headed the string or been up close to the foot of the string?" Answer: "Oh, yes; he had headed the string when the packers or guides was riding him." The guide was

then asked if he had ever before seen Chiggers as the last of the string and the answer was in the negative.

Along on the trip, "Chiggers" pressed the mule immediately in front of him, seemingly attempting to pass by on the outer side of the trail. There is testimony of conversation and laughter between members of the party directed to the mule's pushing against the mule ahead, and once his bridle got caught in the other mule's tail. One member remarked that Chiggers "must have a bee in his bonnet." A woman of the party testified that she thought from what she heard that the animal must be bucking. When asked to give the conversation she heard, or its substance, she replied, "Well, they kept kind of kidding him [Mateas] about the mule and—I don't know." No one else made any reference to "bucking" and Mateas testified that his mule did not buck until as hereinafter related. Later in the progress of the case, counsel for Harvey asked Mr. Mateas the following question: "At the time that the accident happened was the first time the mule had bucked during the entire trip; is that not right?" To which Mr. Mateas answered, "Yes sir." It is thus seen that neither party to the action claims the mule bucked before its action which resulted in Mateas' being thrown.

The group stopped for luncheon at Indian Springs, a place well down into, but not at the bottom of, the canyon, and after lunch Mateas and Mr. Boles, the rider immediately ahead of him in the string before lunch, exchanged mounts. It is somewhat uncertain whether this was originally through error or by design, but at any rate, and after some discussion between the two, the change was agreeable to both men. The guide, however, after hearing the men explain that perhaps Mr. Boles, an experienced rider, could better control Chiggers' habit as just related, would not consent to the change, and the men resumed their former mounts and the party proceeded down the trail in the order as before lunch. At a point of time between a half an hour and an hour, when the party was nearing the bottom of the canyon, Mr. Boles' mule stopped long enough for the string to get a few lengths ahead. Urged by the application of Mr. Boles' heel, his mule hurried to catch up with the string, which had now stopped. Chiggers hurriedly closed the breach and then, without further apparent provocation, proceeded to buck, continuing in such rough stuff until he had thrown Mateas forward to the ground, causing him serious bodily injury.

Appellant prays for the reversal of the judgment for compensatory damages upon the claim that prejudicial hearsay evidence was received over his objection, and that a prejudicial, erroneous instruction was given the jury, as to which he duly excepted.

The claimed prejudicial evidence was as to the conversations between members of the party directed to Chiggers' antics as heretofore related. Harvey claims that the conversation was not within the hearing of the guide, hence was hearsay, and Mateas claims it was well within the guide's hearing. The court did not think so. Upon admitting the conversations for a limited purpose, the court informed the jury that the conversations were not to be considered as proof that anything which the conversations may have alluded to was a fact, but as proof only of what was said. The court explained the situation several times so that jury and counsel would clearly understand the limited purpose for which the conversations were admitted. In support of the court's position, which we think is the correct one, we cite: Liebrandt v. Sorg, 133 Cal. 571, 65 P. 1098; Smith v. Whittier, 95 Cal. 279, 30 P. 529; People v. McCrea, 32 Cal. 98; People v. Estrado, 49 Cal. 171; Wharton on Evidence, § cc. 254; Greenleaf on Evidence, § cc. 100; Starkie on Evidence, § 89. The California cases are cited as comprehensive statements of what we believe to be general law.

However, even if the ruling was erroneous, the error does not call for the reversal of the judgment. It is the theory of Mateas that, since he had been assured of the dependability of Harvey's mules, it was negligence for Harvey to assign a mule to him which was freshly in from pasture and which had been used to lead the pack string. Neither of these facts was known to Mateas. Further, it is Ma-

teas' idea that Harvey was additionally negligent in that the guide, acquainted with these facts and acquainted with Chiggers' habit of the morning, permitted and persisted in Mateas' continuing to ride the mule after lunch. Before the start on the trail after lunch, the actions of Mr. Mateas' mule were made clear to the guide, and the jury had evidence that the actions had been clear to him. The evidence seems all one way to the effect that Chiggers did push ahead as several witnesses testified, and the conversations between the riders to which the criticism is directed reveals nothing further. We hold that the admission of the conversations was in no wise prejudicial to Harvey.

It is claimed by appellant that the judgment must be reversed because the court gave the following instruction to the jury: "The defendant was not an insurer of the safety of the plaintiff. The plaintiff assumed all risks which he knew, or in the exercise of ordinary care should have known, were inherent in the trip; but the plaintiff did not assume any risk which was proximately caused by the failure of the defendant, either before or at the time of the accident, to exercise ordinary care under the circumstances."

In considering this point, the instruction given must not be regarded as a statement of law detached from the evidence in the case. The claimed vice in the instruction is that it did not inform the jury that Mateas assumed the risk incident to his own negligence. Of course, if there is any evidence in the case which would support a conclusion that Mateas was himself negligent and that such negligence was a proximate cause of the happening which caused his injury, the instruction was fatally defective. But any statement in the instruction as to the effect of Mateas' own negligence could be pertinent only in case there was such evidence in the case.

■ We agree to the assertion made in Harvey's opening brief that "it is a well established rule of law [that] he who consents to an act is not harmed by it." But the rest of the paragraph in which the quotation is found is not quite accurate. The paragraph continues: "and that a person who voluntarily continues to participate in a venture after a knowledge of its danger, whether occasioned by the negligence of another or not, cannot recover from an injury resulting from that venture." In the circumstances related in the statement, an injured person is precluded from recovery only if the injury results from the very danger of which he has knowledge. Although he may know of the danger and by his own volition engages in a dangerous enterprise or consents to negligent dangerous action, he assumes no risk except those inherent therein. If he is injured by some additional negligent act, he has not assumed the risk of it.

The point is well made in Weis v. Davis, 28 Cal.App.2d 240, 244, 82 P.2d 487, 488, one of the cases cited by Harvey to support the text of his brief. The injured party had assumed the risk of riding in an automobile at 72 miles per hour in testing its speed capabilities, but he did not assume, so the court held, the risk of injury occasioned by the driver's looking to the rear and then turning his attention to the speedometer so that he did not see approaching automobiles. We quote: "Granting that the plaintiff assumed the risk of traveling 72 miles an hour, there was nothing in the record showing he assumed the additional risks just mentioned".

It is not the law that the assumption of a risk of an adventure by one who knows that negligence is being committed assumes the risk of additional negligence. Pollock says in his "The Law of Torts" (12th ed. p. 168) " * * * there must be consent to the particular act or operation which is hazardous, not a mere general assent inferred from knowledge that risk of a certain kind is possible." In Graff v. United Railroads, 178 Cal. 171-176, 172 P. 603, 605, a judgment for the defendant was reversed because an erroneous instruction had been given. The court said: "Specifically the vice of the instruction is that it charges the plaintiff with the assumption of all increased risks, whereas, the only increased risks which he assumed were those occasioned by his position and arising from the due operation of the car by the motorman who had knowledge of that position."

■ The assumption of risk is much more narrow than stated by appellant in

the instant case, as just a few short quotations from the text of Prosser on Torts (Hornbook Series 1941) will show:

Page 377: "In its primary and proper sense it (assumption of risk) means that the plaintiff has consented to relieve the defendant of an obligation of conduct toward him, and to take his chance of injury from a known risk."

Page 383: "Knowledge of the risk is the watchword of assumption of risk" a quotation from Cincinnati, N. O. & T. P. R. Co. v. Thompson, 6 Cir., 1916, 236 F. 1, 9.

Page 385: "Furthermore, he must not only know of the facts which create the danger, but he must comprehend and appreciate the danger itself."

Page 389: "If, however, he [plaintiff] surrenders his better judgment upon an assurance of safety or a promise of protection, he does not assume the risk, unless the danger is so obvious and so extreme that there can be no reasonable reliance upon the assurance."

Page 390: "By placing him [plaintiff] in the dilemma, the defendant has deprived him of his freedom of choice, and so cannot be heard to say that he has voluntarily assumed the risk."

Mateas, of course, assumed the inherent and inevitable risks of riding a gentle, well-trained and ordinarily safe mule down the canyon in the string of mules under the supervision of a competent attendant guide.

■■■ It may be that Mateas' consent to remount was a limited assumption of risk. If so, he assumed no more risk than the morning's experience acquainted him with or reasonably suggested. The mule had pressed forward habitually. But it cannot be said that Mateas assumed whatever risk there was in riding the animal fresh from pasture and which had been used to leading the string. He had no knowledge of such risk. It was the duty of the jury to determine whether, from all of the evidence, appellant knew or should have known that it was negligence to mount an inexperienced rider upon an animal of such history.

It would have been erroneous to have submitted to the jury the question of whether or not the mere pressing forward of Chiggers during the morning was competent evidence to overcome a possible jury finding that appellant was negligent in originally mounting the inexperienced Mateas upon a fresh-from-pasture animal which very likely would resent the awkwardness of Mateas, and in remounting him after the guide knew the mule had been extra anxious to press forward. In other words, the evidence supports the thesis that the mule was not gentle and safe and that the mule's unruliness caused the injury. There is no evidence sufficient to present the point to the jury that Mateas assumed the risk that caused his injury. It follows that submitting this question to the jury would have been error. As said in Valencia v. San Jose Scavenger Co., 21 Cal.App.2d 469, 473, 69 P.2d 480, 482, certain recited conduct constituting "a want of ordinary care which proximately contributed to his [plaintiff's] injuries, is a question of fact to be submitted to the jury, *unless from the evidence but one conclusion* might *reasonably* be drawn." (Our emphasis.)

■■■ Again, Pollock says, page 461: "We have said that the amount of caution required of a citizen in his conduct is proportional to the amount of his apparent danger." And Pollock, at 453: "The question of negligence is one of law for the court only where the facts are such that all reasonable men must draw the same conclusion from them." At 455: "As between the plaintiff and defendant, however, evidence of negligence which cannot be reasonably deemed the cause of his injury is plainly the same thing as a total want of evidence."

In Chesapeake & Ohio R. Co. v. Proffitt, 241 U.S. 462, 468, 36 S.Ct. 620, 622, 60 L.Ed. 1102, an instruction was requested and refused. The Supreme Court said: "Negligence in the doing of the work was the gravamen of plaintiff's complaint, in his declaration as in his evidence, and defendant was not entitled to an instruction making the pursuit of a customary system decisive of the issue, without regard to whether due care was exercised in doing the work itself. Even if plaintiff knew and assumed the risks of an inherently dangerous method of doing the work, he did not

assume the increased risk attributable not to the method, but to negligence in pursuing it."

Gila Valley, G. & N. R. Co. v. Hall, 232 U.S. 94, 34 S.Ct. 229, 231, 58 L.Ed. 521, is a case which arose in Arizona before Statehood and concerning an instruction. The court made the following general statement as to the law of assumed risk: "Moreover, in order to charge an employee with the assumption of a risk attributable to a defect due to the employer's negligence, it must appear not only that he knew (or is presumed to have known) of the defect, but that he knew it endangered his safety; or else such danger must have been so obvious that an ordinarily prudent person, under the circumstances, would have appreciated it." (Citing numerous authorities.)

We think it would be stretching the doctrine of assumption of risk beyond any reasonable point to say in all of the circumstances of this case that Mateas could reasonably have assumed from the by-passing habit of his mount that he was vicious or so dangerously spirited that he was liable to practice the trick of bucking.

We think the court was correct in phrasing and limiting the questioned instruction as he did.

Affirmed.